IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**ALAN HAYES**,

        Plaintiff,

    v.

**CAROLYN W. COLVIN**,
Acting Commissioner of the Social Security
Administration,

        Defendant.

_____

**Civ. No. 3:13-cv-01506-MC**

**OPINION AND ORDER**

**MCSHANE, Judge**:

    Plaintiff Alan Hayes brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for supplemental security income payments (SSI) under Title XVI of the Social Security Act. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). The issues before this Court are: (1) whether the Administrative Law Judge (ALJ) erred in evaluating the evidence submitted by examining physician, Dr. Vancura; and (2) whether the ALJ erred in forming plaintiff's residual functional capacity (RFC), and as a result, relied on erroneous vocational expert (VE) testimony at step five of the sequential evaluation. Because the ALJ articulated specific and legitimate reasons supported by substantial evidence in the record for partially rejecting Dr. Vancura's opinion, and because the ALJ's findings under step five of the sequential evaluation are supported by substantial evidence, the Commissioner's decision is AFFIRMED.

## PROCEDURAL AND FACTUAL BACKGROUND

1 – OPINION AND ORDER

Plaintiff applied for SSI on January 25, 2010, alleging disability since December 22, 2009. Tr. 22, 152–57, 169. This claim was denied initially and upon reconsideration. Tr. 22, 73–74, 88–89. Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ), and appeared before the Honorable Richard A. Say on March 13, 2012. Tr. 22, 37–61. ALJ Say denied plaintiff's claim by a written decision dated March 28, 2012. Tr. 22–32. Plaintiff sought review from the Appeals Council, which was subsequently denied, thus rendering the ALJ's decision final. Tr. 1–3. Plaintiff now seeks judicial review.

Plaintiff, born on February 6, 1975, tr. 31, 152, graduated high school and attended special education classes, tr. 41, 175, and more recently attended community college classes for webpage design, tr. 406. Plaintiff was thirty-four at the time of alleged disability onset, and thirty-seven at the time of his hearing. *See* tr. 31, 41, 152.[1] Plaintiff alleges disability due to: chronic obstructive pulmonary disease (COPD), obesity, learning disorder, and anxiety disorder. Tr. 24.[2]

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence on the record. *See* 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). To determine whether substantial evidence exists, this Court reviews the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).

---

[1] Plaintiff was a "younger person" at the time of alleged disability onset and at the time hearing. *See* 20 C.F.R. § 404.1563(c).

[2] Plaintiff cites additional limitations not listed as severe impairments by the ALJ, including: sleep apnea and back pain. Pl.'s Br. 2, ECF No. 12 (citing tr. 174).

## DISCUSSION

The Social Security Administration utilizes a five step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The initial burden of proof rests upon the claimant to meet the first four steps. If a claimant satisfies his or her burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner's burden is to demonstrate that the claimant is capable of making an adjustment to other work after considering the claimant's RFC, age, education, and work experience. *Id*.

Plaintiff contends that the ALJ erred in determining and applying plaintiff's RFC under step four and five of the sequential evaluation.[3] In particular, plaintiff argues that: (1) the ALJ erred in evaluating Dr. Vancura's testimony; and (2) the ALJ erred in forming plaintiff's RFC, and as a result, relied on erroneous VE testimony at step five of the sequential evaluation.

## I. Dr. Vancura's Opinion

Plaintiff contends that the ALJ erred in his consideration of Dr. Vancura's opinion. *See* Pl.'s Br. 5–8, ECF No. 12. In response, defendant argues that the ALJ provided sufficient reasons for partially rejecting Dr. Vancura's opinion. *See* Def.'s Br. 8–10, ECF No. 16.

"To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Bayliss v. Barnhart*,

---

[3] In determining plaintiff's RFC, the ALJ found:

> [T]he claimant is capable of at least a simple level of reading, [writing], and arithmetic, and has the residual functional capacity to perform light work . . . . He should avoid concentrated exposure to fumes, odors, and gases and he is limited to performing unskilled work and routine tasks. He should have no interaction with the general public and only superficial interaction with co-workers, involving no close cooperation or coordination. He cannot perform tasks at a production line or speeded pace.

Tr. 26.

427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995)). "If a treating or examining doctor's opinion is contracted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id*. (citation omitted). When evaluating conflicting medical opinions, an ALJ need not accept a brief, conclusory, or inadequately supported opinion. *Id*. (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)).

Plaintiff met with Ryan Vancura, M.D., on April 20, 2010 for a twenty-minute consultative examination. *See* tr. 340–344. Dr. Vancura diagnosed plaintiff with sleep apnea, chronic lower back pain, and reactive airways disease. Tr. 344. As a result of these diagnoses, Dr. Vancura opined:

> The number of hours the claimant could be expected to stand and walk in an eight-hour workday is up to four hours given the claimant's limited breathing capacity and lower back pain. Nevertheless, once the patient is under regular medical care and his asthma is better controlled, then reevaluation could be performed.
>
> The number of hours the claimant would be able to sit in an eight-hour workday is not restricted.
>
> There are no assistive devices.
>
> The amount of weight the claimant could lift or carry is 25 pounds frequently and 50 pounds occasionally.
>
> . . .
>
> Workplace environmental activities: The claimant should not work around dust, fumes, gases due to his reactive airways disease, but is otherwise not limited from working at heights, heavy machinery.

Tr. 344.

The ALJ, having reviewed Dr. Vancura's treatment notes and objective findings, assigned "some weight" to Dr. Vancura's opinion. Tr. 30. The ALJ explained:

4 – OPINION AND ORDER

> [T]he medical evidence of record as a whole supports a finding that the
> claimant can stand and walk for 6 hours in an 8 hour day, not 4. The
> undersigned also finds that the claimant is further limited due to his COPD
> and obesity in that he can lift and carry 20 pounds occasionally and 10
> pounds frequently, for 6 hours in an 8 hour day; and should avoid
> concentrated exposure to fumes, odors, dusts, and gases.

Tr. 30.

Plaintiff contends that the "medical evidence of record as a whole" does not support the

ALJ's conclusion that plaintiff is capable of walking and standing *six*, instead of four hours in an

eight hour work day. *See* Pl.'s Br. 6, ECF No. 12. This Court looks to the record.

Agency consultant, Richard Alley, M.D., considered Dr. Vancura's opinion, but opined

on June 15, 2010 that plaintiff did not have any exertional limitations. Tr. 69–70. Dr. Alley

concluded that Dr. Vancura's opinion was "not consistent with Totality of mer objective

findings, 04/27/10 NL EXAM and mild DDD of LS per XR." Tr. 65. Agency consultant, Linda

L. Jensen, M.D., affirmed Dr. Alley's opinion on November 22, 2010. Tr. 84.

The ALJ assigned "some weight" to Dr. Alley's opinion. Tr. 30. The ALJ elaborated:

> The medical evidence of record supports a finding that the claimant must
> avoid concentrated exposure to fumes, odors, dusts, gases as a result of his
> COPD, and the undersigned has adopted this limitation. However, the
> record as a whole reveals that the claimant is further limited in his ability
> to stand, walk, sit, lift, and carry due to his COPD and obesity, as found
> herein.

Tr. 30. Because the ALJ adopted Dr. Alley's opinion in part and that opinion contradicted Dr.

Vacura's opinion, Dr. Vacura's opinion may only be rejected if the ALJ gave "specific,

legitimate reasons for doing so that are based on substantial evidence in the record." *Andrews v.*

*Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *see also Bayliss*, 427 F.3d at 1016. The opinions of

Drs. Alley and Jensen "may serve as substantial evidence when they are supported by other

evidence in the record and are consistent with it." *Andrews*, 53 F.3d at 1041.

5 – OPINION AND ORDER

The ALJ, having reviewed the medical evidence of record, concluded that this evidence as a whole supported a finding that plaintiff could stand and walk six hours in an eight hour day. Tr. 30. The ALJ further emphasized that plaintiff's treatment had been essentially routine and/or conservative in nature, and that plaintiff had never been hospitalized for his COPD. Tr. 29.

These findings, particularly the ALJ's characterization of plaintiff's treatment as routine and conservative in nature, are supported by substantial evidence. Between February 2009 and March 2012, plaintiff received regular treatment for COPD-related breathing difficulties. That treatment typically resulted in a prescription (or refill) of anti-inflammatory medication, pain medication and aerosol inhalers, and a recommendation that plaintiff quit smoking. *See, e.g.*, tr. 247–48, 265–73, 289, 378. Plaintiff's COPD exacerbations regularly improved with treatment, tr. 269, 377–78, despite his reoccurring smoking, tr. 289, 374. On December 30, 2009, plaintiff underwent a chest examination, "W-CHEST ROUTINE PA/AP AND LAT." Tr. 242. The results of that examination were determined "unremarkable," and plaintiff's lungs were found to be clear. *Id.*; *see also* tr. 353 (On March 4, 2010, Dr. Gustavsson evaluated chest examination results and concluded that plaintiff's "lungs [were] otherwise fully expanded and clear. No effusion or pneumothorax"); tr. 372 (On September 8, 2011, Dr. Henriques noted that plaintiff's chest was clear without wheezing or rales.); tr. 371 (On January 1, 2012, Dr. Henriques noted that plaintiff's chest was clear without wheezing or rales.). On January 23, 2012, plaintiff underwent an additional chest x-ray examination. Tr. 391. The results of that examination indicated that plaintiff's lungs were clear with no evidence of pleural effusion or pneumothorax. *Id.*

The medical record also includes infrequent instances of treatment for an unspecified backache. *See, e.g.*, tr. 359, 367–68, 372. That treatment generally consisted of a prescription for

6 – OPINION AND ORDER

ibuprofen. *See* tr. 359. On April 27, 2010, plaintiff underwent a lumbar spine examination. Tr. 345. Ryan Taylor, M.D., subsequently reviewed those examination results and opined:

> There is normal alignment of the lumbar spine. The vertebral bodies are of normal stature. The intervertebral disk spaces appear relatively preserved. There is mild degenerative endplate lipping at the L2-3 and L3-4 level. The pedicles and neural arches appear grossly intact . . . . Minimal degenerative changes in the lumbar spine.

Tr. 345. Dr. Taylor's opinion, which was explicitly considered by Dr. Alley, but *not* by Dr. Vancura, is consistent with the opinions of Drs. Alley and Jensen and the ALJ's RFC findings. *See* tr. 340 (indicating that Dr. Vancura only considered "Multnomah County Health Department notes and plaintiff's SSA form 3368").

Accordingly, the ALJ's reliance on the opinions of Drs. Alley and Jensen, which are supported by and consistent with other evidence in the medical record, is sufficient to partially reject Dr. Vancura's opinion.

## II. RFC Limitations and Vocational Expert Testimony

Plaintiff contends that the ALJ erred in forming plaintiff's RFC by including non-functional and vague limitations, and as a result, relied on erroneous VE testimony at step five of the sequential evaluation. Pl.'s Br. 8–18, ECF No. 12.

Plaintiff first argues that the ALJ's finding—"[plaintiff] is limited to performing unskilled work"—constitutes a non-functional limitation that impermissibly required the VE to "testify that [p]laintiff could perform those occupations, notwithstanding his mental impairments." Pl.'s Br. 12–13, ECF No. 12.

As defined in 20 C.F.R. § 416.968, "unskilled work" is "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." *See also* 20 C.F.R. § 404.1568. This limitation reflects a functional, but non-exertional mental

7 – OPINION AND ORDER

impairment. *See* SSR 85-15, 1985 WL 56857 at *4 (Jan. 1, 1985) ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions . . . ."); *see also* SSR 00-4P, 2000 WL 1898704, at *3 (Dec. 4, 2000) (indicating that "unskilled work corresponds to an SVP of 1-2"). As a functional limitation, the ALJ did not err by including it within plaintiff's RFC. *See* SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996) (indicating that the "RFC assessment must first identify the individual's functional limitations or restrictions . . . including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545"); 20 C.F.R. § 404.1545(c) (indicating that "[a] limited ability to carry out certain mental activities, such as limitations in understanding . . . may reduce [a claimant's] ability to do . . . other work.).

Plaintiff next argues that the ALJ's finding—"the claimant is capable of at least a simple level of reading, [writing],[4] and arithmetic"—is vague and could reflect varying level of abilities under the <u>Dictionary of Occupational Titles</u> (4th ed. 1991) (DOT). If, for example, the ALJ intended to limit plaintiff to language development level-one, instead of language development level-two, then plaintiff arguably would be precluded from all three positions identified at step five in the sequential evaluation. *See* DOT § 209.687-026 (mailroom clerk, R3 M1 L2); DOT § 813.684-022 (solderer, R2 M2 L2); DOT § 239.567-010 (office helper, R2 M2 L2).[5] In response, defendant directs this Court's attention to the record, e.g., tr. 328–39, and argues that the ALJ's

---

[4] The ALJ mistakenly substituted "reading" for "writing" in his RFC findings. *See* tr. 26. However, during the administrative hearing, the ALJ discussed plaintiff's "reading, writing, and arithmetic" skills. Tr. 56. Thus, any omission in the written decision constitutes a harmless error. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (noting that "[w]e have . . . deemed errors harmless where the ALJ misstated the facts . . . but we were able to conclude from the record that the ALJ would have reached the same result absent the error." (citation omitted)).

[5] These figures correspond to the DOT definition trailer, which includes a general education development (GED) Scale. *See* DOT, App. C, *available at* 1991 WL 688702 (1991). The GED scale is composed of three divisions: reasoning development (R), mathematical development (M), and language development (L). *Id.*

8 – OPINION AND ORDER

pace restriction—"[h]e cannot perform tasks at a production line or speeded pace"—accounts for plaintiff's medically supported limitations. Def.'s Br. 12, ECF No. 16.

Turning to the record, this Court notes that plaintiff underwent a psychodiagnostic evaluation[6] on March 29, 2010. Tr. 328–339. Based upon plaintiff's performance, Dr. Adams found that plaintiff performed consistently in either the average or high average range in verbal/language functioning, visual-spatial constructional functioning, and attention and concentration categories, but borderline in the psychomotor speed category. Tr. 336. Because of this discrepancy, Dr. Adams determined that plaintiff "is better able to attend and manipulate information received visually when he is allowed plenty of time to execute the task." Tr. 337.

On May 18, 2010, agency consultant Sandra Lundblad, Psy.D., opined that plaintiff had moderate limitations in his ability to understand and remember detailed instructions, interact appropriately with the general public, respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions. Tr. 70–71. Despite these limitations, Dr. Lundblad concluded that plaintiff was capable of performing simple, routine tasks with casual but not close sustained public contact. Dr. Lundblad also opined, consistent with Dr. Adams's findings, that plaintiff faced difficulties learning detailed/complex instructions. Tr. 71–72. As a result, Dr. Lundblad concluded that plaintiff "will work best independently once tasks are learned in an environment not requiring speeded production." Tr. 72. Agency consultant, Dorothy Anderson, Ph.D., affirmed Dr. Lundblad's opinion on November 22, 2010. Tr. 87.

---

[6] Plaintiff was administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) and Mini-Mental State Exam. Tr. 328.

9 – OPINION AND ORDER

The ALJ, having considered all three opinions, assigned "great weight" to Dr. Adams's opinion regarding plaintiff's psychomotor speed limitations and "limited the claimant to no tasks at a production line or at a speeded production line type situation to account for" this limitation. Tr. 30. The ALJ also, on the basis of plaintiff's anxiety and learning disability, limited plaintiff to "performing unskilled work and routine tasks . . . . no interaction with the general public and only superficial interaction with co-workers, involving no close cooperation or coordination." Tr. 26, 31.

This Court, having reviewed this relevant context, returns to the limitation at issue: "the claimant is capable of *at least* a simple level of reading, [writing], and arithmetic." Tr. 26 (emphasis added). That limitation, instead of reflecting the outer-limit of plaintiff's capabilities, *see* 20 C.F.R. § 404.1545(a) (defining RFC as "the most" a claimant can do), suggests that plaintiff may be capable of higher levels of reading, writing, and arithmetic. As a result, the ALJ's phrasing of that limitation constitutes an error.

However, a decision by the ALJ will not be reversed for an error that is harmless, i.e., "inconsequential to the ultimate nondisability determination." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). The ALJ's error, under these circumstances, is harmless. Assuming that this erroneously phrased limitation is interpreted as restricting plaintiff to a "simple"[7] level of reading, writing, and arithmetic, that restriction is not necessarily inconsistent with the GED Scale divisions "R," "M," and "L" associated with the ALJ's step five findings. *See supra* note 5 (discussing GED divisions in DOT). As indicated in case law within and outside of this circuit, the ability to perform simple, routine, repetitive work is not inconsistent

---

[7] This Court notes that plaintiff's limitation to "unskilled work" also encompasses a restriction to "simple duties." *See* 20 C.F.R. § 416.968.

with reasoning development level-two. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (noting that "level-two reasoning appears more consistent with" simple and routine work tasks), *Gottschalk v. Colvin*, Civil No. 6:13-cv-00125-JE, 2014 WL 1745000, at *6 (D. Or. May 1, 2014) (concluding that level-two reasoning is not inconsistent with "simple, routine, repetitive work"); *Maxwell v. Comm'r Soc. Sec. Admin.*, No. 3:12-cv-00475-HU, 2013 WL 4087558, at *19 (D. Or. Aug. 12, 2013) (same).[8] Nor is simple, routine, repetitive work inconsistent with mathematical development or language development level-two under these circumstances. *See Works v. Comm'r Soc. Sec. Admin.*, 804 F. Supp. 2d 1089, 1095 (D. Or. 2011) (concluding that an RFC limitation of one to three steps, which encompasses the ability to perform simple, routine work tasks, "should be interpreted as reflecting DOT's GED levels 1 and 2"); *Savage v. Barnhart*, 372 F. Supp. 2d 922, 930–31 (S.D. Tex. 2005) (concluding that a marginal education, i.e., a sixth grade education, an ability to perform simple unskilled work as well as semiskilled work, passage of a written driver's examination test, and an ability to read the bible, is not inconsistent with language development level-two).

Plaintiff has failed to point to any evidence that the jobs identified by the VE required reasoning or mathematical skills above those he possesses. Instead, the record indicates that plaintiff is capable of at least level-two reasoning and mathematical development.[9] Plaintiff does

---

[8] *See also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (concluding that reasoning level-three is not inconsistent with a "cognitive capacity to follow simple instructions"); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (concluding that an ALJ's failure to ask the VE about possible conflicts between his testimony and the DOT was harmless because reasoning level-three is not inconsistent with unskilled work that does not appear to be "complex").

[9] Dr. Adams, having administered plaintiff's psychodiagnostic evaluation, concluded that plaintiff performed consistently in the average to high average performance in three intellectual functional areas: Verbal/Language, Visual-Spatial Constructional, and Attention and Concentration. Tr. 336. All three of these functional areas include a reasoning component. For example, Visual-Spatial Constructional Functioning "involves perceptual and fluid reasoning, spatial processing, and visual-motor integration." *Id.* Plaintiff performed in the average to high average range in Visual-Spatial Constructional Functioning. *Id.*

assert that his Adult Function Report reflects level-one, not level-two, language development.

Pl.'s Br. 11, ECF No. 12. An individual at language development level-two is capable of:

> Reading:
> Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.
>
> Writing:
> Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.
>
> Speaking:
> Speak clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future tenses.

DOT, App. C, *available at* 1991 WL 688702 (1991). In contrast, an individual at language

development level-one is capable of:

> Reading:
> Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.
> Compare similarities and differences between words and between series of numbers.
>
> Writing:
> Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.
>
> Speaking:
> Speak simple sentences, using normal word order, and present and past tenses.

*Id*. Plaintiff directs this Court to two sentences in his Adult Function Report. *See* tr. 191–198.

First, in describing his daily activities, plaintiff reported: "It changes everyday but I have to leave

the shelter everyday I try to find a place to go to into the shelter open and somedays I go to the

doctor office." Tr. 191. Second, in explaining his abilities, plaintiff reported: "25 pounds, 5

blocks can't breath when I bend, reach, talk, climb stairs I cannot concentration because I am try

12 – OPINION AND ORDER

to catch my breath." Tr. 196. Both sentences reflect writing limitations, and may even suggest writing skills more consistent with language development level-one. *But see* tr. 336 (Dr. Adams, having administered plaintiff's psychodiagnostic evaluation, concluded that plaintiff performed consistently in the average range in Verbal/Language Functioning). However, as noted by other Courts within this district, the GED Scale describes the level of education *generally* required for a particular job, but does not necessarily impose job requirements. *See, e.g.*, *Chase v. Colvin*, No. 1:12-cv-00884-AA, 2013 WL 3821630, at *3 (D. Or. July 22, 2013).

The three positions identified by the VE, mailroom clerk, solderer and office helper, all list language development level-two on the GED Scale. *See* DOT § 209.687-026 (mailroom clerk, R3 M1 L2); DOT § 813.684-022 (solderer, R2 M2 L2); DOT § 239.567-010 (office helper, R2 M2 L2). Yet, as described in the DOT, only the mailroom clerk and office helper positions include minimal, if any, writing requirements.[10] For example, a mailroom clerk may

---

[10] DOT § 209.687-026 describes as the duties of a "Mail Clerk" as follows:

> Sorts incoming mail for distribution and dispatches outgoing mail: Opens envelopes by hand or machine. Stamps date and time of receipt on incoming mail. Sorts mail according to destination and type, such as returned letters, adjustments, bills, orders, and payments. Readdresses undeliverable mail bearing incomplete or incorrect address. Examines outgoing mail for appearance and seals envelopes by hand or machine. Stamps outgoing mail by hand or with postage meter. May fold letters or circulars and insert in envelopes [FOLDING-MACHINE OPERATOR (clerical) 208.685-014]. May distribute and collect mail. May weigh mail to determine that postage is correct. May keep record of registered mail. May address mail, using addressing machine [ADDRESSING-MACHINE OPERATOR (clerical) 208.582-010]. May be designated according to type of mail handled as Mail Clerk, Bills (clerical).

DOT § 239.567-010 describes the duties of an "Office Helper" as follows:

> Performs any combination of following duties in business office of commercial or industrial establishment: Furnishes workers with clerical supplies. Opens, sorts, and distributes incoming mail, and collects, seals, and stamps outgoing mail. Delivers oral or written messages. Collects and distributes paperwork, such as records or timecards, from one department to another. Marks, tabulates, and files articles and records. May use office equipment, such as envelope-sealing machine, letter opener, record shaver, stamping machine, and transcribing machine. May deliver items to other business establishments [DELIVERER, OUTSIDE (clerical) 230.663-010]. May specialize in

"readdress undeliverable mail . . . . [and] keep record of registered mail," DOT § 209.687-026,

while an office helper "[m]arks, tabulates, and files articles and records," DOT § 239.567-010.

The solderer position, on the other hand, does not include a writing component.[11] Accordingly,

all three positions do not involve any language development skills beyond plaintiff's capabilities.

*Cf. Dinesen v. Colvin*, No. 3:13-cv-01554-MA, 2014 WL 6490562, at *8–9 (D. Or. Nov. 19,

2014) (concluding, based upon a DOT description, that a garment sorter position did "not

involve any computation or math skills beyond plaintiff's math skills").

      This Court's inquiry is not finished. Plaintiff also challenges his ability to perform each

position on additional bases.

      As to the mailroom clerk position, plaintiff argues that his limitation to "simple, routine

tasks" is inconsistent with reasoning development level-three. This Court agrees. Although the

Ninth Circuit Court of Appeals has not definitively answered this question, "the majority of

district courts within the Ninth Circuit have concluded that there is a conflict." *Gottschalk*, 2014

WL 1745000, at *6 (citations omitted).[12] Because the VE did not explain this apparent

---

delivering mail, messages, documents, and packages between departments of
establishment and be designated Messenger, Office (clerical). May deliver stock
certificates and bonds within and between stock brokerage offices and be designated
Runner (financial).

[11]DOT § 813.684-022 describes the duties of a "Solderer" as follows:

    Solders together components of metal products on production line, using hand soldering
iron and soft solder: Dips workpieces into chemical solution or brushes or powders flux
along joints to remove impurities. Places workpieces into fixtures or manually holds them
together at designated point. Plunges soldering iron into chemical to clean tip. Positions
tip of heated soldering iron and wire or bar of solder to joint until solder melts and seeps
into joint. Guides iron and solder along seams. Removes workpiece when color indicates
that solder has cooled and bonded workpieces together. May sweat together workpieces
coated with solder. May solder with self-fluxing solder. May adjust controls of gas flame
or electric induction coils to specified point on dial to heat soldering iron.

[12] *See, e.g.*, *Celedon v. Colvin*, No. 1:13-cv-00449-SMS, 2014 WL 4494507, at *9 (E.D. Cal. Sept. 11, 2014) ("The
weight of authority in this circuit, including in this district, has concluded that a limitation to simple, repetitive tasks
is inconsistent with the DOT's description of jobs requiring GED reasoning Level 3." (citations omitted)); *Moore v.
Colvin*, No. CV 13-3488-DFM, 2014 WL 696419, at *2 (C.D. Cal. Feb. 24, 2014) (concluding that a limitation to

discrepancy, the ALJ's reliance on this part of the VE's testimony was in error. *See* SSR 00-4P, 2000 WL 1898704, at *2 ("When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence . . . .").

As to the solderer position, plaintiff argues that his limitation regarding concentrated exposure to fumes, odors and gases conflicts with the environmental conditions associated with this position. As explained in the <u>Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles</u>, Pt. A, 06.04.31 (1993) (SCO), the solderer position has an "F" in the "AC" column. In other words, atmospheric conditions (AC),[13] occur frequently (F)[14] in that position. *Id*. at App. D., D-2. This Court, in agreement with plaintiff, finds that the VE did not explain this apparent discrepancy. Absent a reasonable explanation by the VE, there is an apparent and unexplained conflict between an avoidance of fumes, odors and gases, and working in a position that entails such exposure one-third to two-thirds of the time. *Id*. at App. D., D-1. Therefore, the ALJ's reliance on this part of the VE's testimony was also in error.

As to the office helper position, plaintiff argues that his limitation to "no interaction with the general public and only superficial interaction with co-workers, involving no close cooperation or coordination" conflicts with the DOT description of that position. *See supra* note 10 (DOT description). Plaintiff emphasizes that part of the DOT description—"Delivers oral or written messages. Collects and distributes paperwork, such as records or timecards, from one

---

simple, repetitive tasks is inconsistent with reasoning level 3); *Boyd v. Astrue*, No. C10-5756-MJP-BAT, 2011 WL 5515517, at *8 (W.D. Wash. May 23, 2011) (concluding that "the ALJ's limitation to simple tasks precludes her from performing the job of order checker which the DOT classified as a Reasoning Level 3 job" (citation omitted)). *Ball v. Astrue*, No. CV-09-764-HU, 2010 WL 3420166, at *15–16 (D. Or. Aug. 27, 2010) (recognizing a conflict between reasoning level three and a restriction to simple, routine, repetitive work with occasional complex tasks).
[13] Atmospheric Conditions are defined in the SCO as: "[e]xposure to such conditions as fumes, noxious odors, dusts, mists, gases, and poor ventilation, that affect the respiratory system, eyes, or the skin." *Id*. at App. D., D-2.
[14] Frequently is defined in the SCO as "[a]ctivity or condition exists from 1/3 to 2/3 of the time." *Id*. at App. D., D-1.

department to another"—necessarily involves cooperation and coordination to some degree and greater than superficial interaction with co-workers. This Court is not persuaded.

As defined in DOT § 239.567-010, *available at* 1991 WL 672232, the need for speaking and signaling in an office helper position is not significant. *See also Brown v. Colvin*, No. 4:13-CV-368-DGK-SSA, 2014 WL 1687430, at *5 (W.D. Mo. Apr. 29, 2014) (noting that "social interaction is not important" for an office helper position (citations omitted)). The DOT defines "Speaking-Signaling" as: [t]alking with and/or signaling people to convey or exchange information. Includes giving assignments and/or directions to helpers or assistants." DOT, App. B. As a result, this Court declines to recognize an apparent conflict between "not significant" speaking and signaling, and superficial interaction involving no close cooperation or coordination.

Accordingly, substantial evidence supports the ALJ's finding at step five that plaintiff could perform other work in the national economy. Because the ALJ need only identify *one* or more jobs that exist in significant number in the national economy, the errors identified are harmless. *See* 20 C.F.R. § 404.1566.

## CONCLUSION

For these reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.


DATED this 30th day of December, 2014.


_____s/ Michael J. McShane_____
**Michael J. McShane**
**United States District Judge**


16 – OPINION AND ORDER